IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Francisco Fernandez,

       Plaintiff,

       v.                     Case No. 2:05-cv-75

City of Pataskala, et al.,

       Defendants.

<u>OPINION AND ORDER</u>

    This is an employment discrimination action brought by plaintiff Francisco Fernandez against the City of Pataskala, Ohio, ("the City"), the City of Pataskala Division of Police,[1] Chief Christopher Forshey and Deputy Chief Roy Nichols. Plaintiff was employed by the Division of Police until his resignation on January 11, 2004. Plaintiff filed his complaint on January 13, 2005, in the Court of Common Pleas of Licking County, Ohio. On January 24, 2005, defendants filed a notice of removal of the action to this court.

    In Count One of the complaint, plaintiff, who is Hispanic, alleged that the City and Chief Forshey discriminated against him on the basis of his race and national origin through wrongful discipline, demotion, harassment and constructive discharge in violation of Ohio Rev. Code §§ 4112.02 and 4112.99. In Count Two, plaintiff alleged that defendants' acts of discrimination resulted in his constructive discharge in violation of the public policy of the state of Ohio. In Count Three, plaintiff asserted a claim

---

[1]Technically speaking, under Ohio law, the Division of Police is not a legal entity capable of being sued; the real party in interest is the City. <u>See</u> <u>Richardson v. Grady</u>, Nos. 77381, 77403 (unreported), 2000 WL 1847588 (Ohio App. Dec. 18, 2000); <u>Ferrell v. Windham Twp. Police Dept.</u>, No. 97-P-0035 (unreported), 1998 WL 156889 (Ohio App. Mar. 27, 1998).

under 42 U.S.C. §1983 against defendants Forshey and Nichols in their official and individual capacities.  In Count Three, plaintiff alleged that defendants Forshey and Nichols discriminated against him by demoting him, disciplining him, and creating a hostile work environment through unequal application of rules, regulations and policies, and that these actions led to plaintiff's constructive termination.  Plaintiff claimed that defendants' actions violated his substantive due process and equal protection rights under the Fourteenth Amendment to the United States Constitution.

This matter is now before the court on the defendants' motions for partial judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) and for summary judgment pursuant to Fed.R.Civ.P. 56.  In his memorandum contra defendants' motion for summary judgment, plaintiff indicated that he was voluntarily dismissing his §1983 official capacity claim against defendants Forshey and Nichols, and his claim of unlawful constructive discharge in violation of public policy (Count Two).  See Doc. No. 34, p. 1.  The court will address the defendants' motions insofar as they pertain to the remaining claims, namely, the discrimination claim against the City and defendant Forshey under §§4112.02 and 4112.99, and the §1983 claim against defendants Forshey and Nichols in their individual capacities.

I. Motion for Partial Judgment on the Pleadings

Defendants have filed a motion pursuant to Fed.R.Civ.P. 12(c) for partial judgment on the pleadings.  Judgment may be granted under Rule 12(c) if the court determines that the moving party is entitled to judgment as a matter of law.  Astor v. International

Bus. Machs. Corp., 7 F.3d 533, 538 (6th Cir. 1993). Courts apply the same analysis to motions for judgment on the pleadings under Rule 12(c) as they apply to motions to dismiss under Fed.R.Civ.P. 12(b)(6). E.E.O.C. v. J.H. Routh Packing Co., 246 F.3d 850, 851 (6th Cir. 2001). A motion for judgment on the pleadings under Rule 12(c) may be granted only if, construing the complaint in the light most favorable to the plaintiff, it is determined that the plaintiff undoubtedly can prove no set of facts in support of his claim that would entitle him to relief. Grindstaff v. Green, 133 F.3d 416, 421 (6th Cir. 1998). In reviewing the motion, this court must accept all of the complaint's factual allegations as true. Wiegler v. IBP Hog Market, Inc., 249 F.3d 509, 511, 512 (6th Cir. 2001).

Defendants Forshey and Nichols first move for judgment on the pleadings on plaintiff's substantive due process claim. In order to state a claim that he was deprived of substantive due process, plaintiff must demonstrate action that shocks the conscience and that amounts to an arbitrary infringement upon personal immunities that are implicit in the concept of ordered liberty. See Rochin v. California, 342 U.S. 165, 172 (1952); LRL Properties v. Portage Metro Housing Authority, 55 F.3d 1097, 1111 (6th Cir. 1995). Courts have been restrictive in expanding substantive due process to include claims other than those relating to marriage, procreation, and the right to bodily integrity. Albright v. Oliver, 510 U.S. 266, 272 (1994).

Plaintiff alleges that he was denied substantive due process due to the defendants' alleged discrimination in administering discipline, investigating him for suspected misconduct, and

3

demoting him from the rank of lieutenant to the rank of police officer, culminating in his constructive discharge.  However, the Sixth Circuit has rejected attempts to expand substantive due process protection to claims involving property interests in employment.  <u>See</u> <u>Sutton v. Cleveland Bd. of Educ.</u>, 958 F.2d 1339, 1350 (6<u>th</u> Cir. 1992)(state-created right to tenured position lacks substantive due process protection); <u>Charles v. Baesler</u>, 910 F.2d 1349, 1355 (6<u>th</u> Cir. 1990)(no substantive due process protection for state-created promotion rights).  The violation of a fundamental right is necessary for a successful substantive due process claim for the termination of public employment.  <u>Perry v. McGinnis</u>, 209 F.3d 597, 609 (6<u>th</u> Cir. 2000).

In addition, because of the highly destructive potential of overextending substantive due process protection, <u>see</u> <u>Washington v. Glucksberg</u>, 521 U.S. 702, 720 (1997)(explaining the dangers), and because the doctrine's borders are so undefined, the Supreme Court has held that the concept of substantive due process has no place when another provision of the Constitution directly addresses the type of illegal governmental conduct alleged by the plaintiff.  <u>See</u> <u>Albright</u>, 510 U.S. at 273 ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'")(quoting <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989)).  <u>See</u> <u>also</u> <u>Montgomery v. Carter County, Tenn.</u>, 226 F.3d 758, 769 (6<u>th</u> Cir. 2000)(analyzing substantive due process claim for taking of private driveway for private use under the Takings Clause).

4

Plaintiff argues that he has alleged the violation of a fundamental right sufficient to sustain a substantive due process claim.  The only fundamental right alleged in his complaint is the right to be treated equally regardless of race and national origin, which falls within the purview of the Equal Protection Clause. Numerous courts have held that where the party's substantive due process claim is based on alleged acts of discrimination, that claim should be analyzed under the framework of the Equal Protection Clause rather than as a substantive due process claim. See, e.g., Eby-Brown Co., LLC v. Wisconsin Dep't of Agriculture, 295 F.3d 749, 754 (7th Cir. 2002)(claims of alleged unequal treatment properly analyzed under the Equal Protection Clause, not as substantive due process claims); Yassini v. City of Sunnyvale, 103 F.3d 143 (table), 1996 WL 711434 (9th Cir. Dec. 5, 1996)(claim concerning validity of ordinance covered by explicit constitutional provisions protecting equal protection, precluding relief on substantive due process theory); Gehl Group v. Koby, 63 F.3d 1528, 1539 (10th Cir. 1995)(claims regarding alleged racially discriminatory animus should be analyzed under explicit guarantees of Equal Protection Clause), implicitly overruled on other grounds by Currier v. Doran, 242 F.3d 905, 916 (10th Cir. 2001); National Paint & Coatings Ass'n v. City of Chicago, 45 F.3d 1124, 1129 (7th Cir. 1995)(economic regulations evaluated under equal protection principles rather than as a substantive due process claim); Curry v. Pulliam, 234 F.Supp.2d 921, 927 (S.D.Ind. 2002)(holding that plaintiff who alleged race discrimination in the termination of his employment had no substantive due process claim because he had alleged a violation of the Equal Protection Clause); Hogan v. State

5

of Connecticut Judicial Branch, 220 F.Supp.2d 111, 123 (D.Conn. 2002)(substantive due process claim alleging race discrimination in termination of employment "should be analyzed exclusively under the law of equal protection, not substantive due process.").

Since plaintiff has alleged no violation of a fundamental right in his complaint other than the alleged violation of his equal protection rights, his §1983 claim must be analyzed according to the laws governing equal protection claims.  The complaint fails to state a separate claim for a violation of substantive due process rights, and to the extent that plaintiff relies on substantive due process as a separate theory of recovery, the defendants are entitled to judgment on the pleadings.

The City has also moved for judgment on the pleadings to the extent that plaintiff has requested an award of punitive damages and attorney's fees on his claim under §4112.02 and 4112.99.

In the general case, §4112.99 authorizes an award of punitive damages upon a showing of actual malice.  Rice v. CertainTeed Corp., 84 Ohio St.3d 417, 422, 704 N.E.2d 1217 (1999).  However, punitive or exemplary damages may not be awarded against a political subdivision unless such damages are specifically authorized by statute.  See Ohio Rev. Code §2744.05(A); Spires v. City of Lancaster, 28 Ohio St.3d 76, syllabus, 502 N.E.2d 614 (1986); Ranells v. Cleveland, 41 Ohio St.2d 1, 6-8, 321 N.E.2d 855 (1975); Franklin v. City of Columbus, 130 Ohio App.3d 53, 63, 719 N.E.2d 592 (1998).  Since there is no language in §§4112.02 and 4112.99 expressly authorizing an award of punitive damages against a political subdivision, plaintiff may not recover punitive damages against the City.

As to attorney's fees, Ohio follows the general "American rule," under which the prevailing party cannot recover attorney's fees in the absence of express statutory authorization. <u>Sorin v. Board of Educ. of Warrensville Hts. School Dist.</u>, 46 Ohio St.2d 177, 179, 347 N.E.2d 527 (1976). Sections 4112.02 and 4112.99 do not specifically authorize an award of attorney's fees. <u>Sutherland v. Nationwide Gen. Ins. Co.</u>, 102 Ohio App.3d 297, 300, 657 N.E.2d 281 (1995). Attorney's fees may be recovered in an action under §4112.99 if punitive damages are awarded. <u>Id</u>., 102 Ohio App.3d at 301. However, since punitive damages are not allowed against a municipal tortfeasor absent statutory authorization, and since §4112.99 does not provide such authorization, then attorney's fees are not recoverable against the City in an action under §4112.99. <u>See Franklin</u>, 130 Ohio App.3d at 63; <u>Henry v. City of Akron</u>, 27 Ohio App.3d 369, 371, 501 N.E.2d 659 (1985).

Plaintiff may not recover punitive damages or attorney's fees against the City on his claims under §§4112.02 and 4112.99, and the City is entitled to partial judgment on the pleadings in that regard.

<u>II. Motion for Summary Judgment</u>

<u>A. Standard for Summary Judgment</u>

Defendants have moved for summary judgment on plaintiff's claims. The procedure for granting summary judgment is found in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

7

The evidence must be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).

The Sixth Circuit Court of Appeals has recognized that Liberty Lobby, Celotex and Matsushita effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. Street v. J. C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989). The court in Street identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. Id. at 1479. In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Id. (quoting Liberty Lobby, 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. Id. It is not sufficient for the nonmoving party to merely "'show

8

that there is some metaphysical doubt as to the material facts.'" Id. (quoting Matsushita, 475 U.S. at 586). Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." Id. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

B. Preemption by Title VII

Plaintiff asserts claims of discrimination based on race and national origin under §4112.02 against the City and defendant Forshey, and claims of discrimination in violation of his equal protection rights under §1983 against defendants Forshey and Nichols in their individual capacities.

Defendants argue that plaintiff should not be permitted to pursue his equal protection claims under §1983 because those claims are preempted by Title VII of the Civil Rights Act of 1964. However, plaintiff has dismissed any claims under §1983 against the City. Since supervisors such as defendants Forshey and Nichols are not subject to suit under Title VII, see Weberg v. Franks, 229 F.3d 514, 522 n. 7 (6th Cir. 2000), plaintiff's only federal avenue of redress against these defendants is under §1983. Further, while it is true that an employee may only sue a public employer under Title VII when the right to be vindicated is one created solely by Title VII, such as Title VII's prohibition against retaliation for invoking Title VII's administrative remedies, an employee who alleges that the employer's conduct violated a provision of the Constitution may also seek remedies provided by §1983 in addition to those created by Title VII. Day v. Wayne County Bd. of

9

<u>Auditors</u>, 749 F.2d 1199, 1204-05 (6th Cir. 1984). <u>See also</u> <u>Birch</u> <u>v. Cuyahoga County Probate Court</u>, 392 F.3d 151, 168-69 (6th Cir. 2004)(§1983 retaliation claim based on the First Amendment not preempted by Title VII). Here, plaintiff has asserted a §1983 claim based on alleged violations of his rights under the Equal Protection Clause, and therefore his §1983 claim is based on a source independent of Title VII and is not preempted by Title VII. <u>See</u> <u>Russell v. Drabik</u>, 24 Fed.Appx. 408, 411 (6th Cir. 2001)(claims of failure to promote and constructive demotion based on equal protection theory properly asserted under §1983).

C. Statute of Limitations - §1983

Defendants also argue that plaintiff's §1983 claim, insofar as it relates to his demotion in 2002, is barred by the statute of limitations. The statute of limitations applicable to a §1983 claim in Ohio is two years. <u>Banks v. City of Whitehall</u>, 344 F.3d 550, 553 (6th Cir. 2003). The statute is triggered when the plaintiff knows or has reason to know of the injury which is the basis of the action. <u>Kelly v. Burks</u>, 415 F.3d 558, 561 (6th Cir. 2005). The plaintiff's demotion occurred in September of 2002, and he knew or had reason to know of his injury at that time. Although plaintiff's demotion was the subject of a union grievance which was not resolved until after plaintiff resigned his position, the pendency of a grievance proceeding does not toll the statute of limitations. <u>See</u> <u>Delaware State College v. Ricks</u>, 449 U.S. 250, 261 (1980); <u>Kelly</u>, 415 F.3d at 561.

Plaintiff argues that this claim is preserved under the continuing violations doctrine. The Sixth Circuit has recognized two distinct categories of continuing violations, those alleging

serial violations and those identified with a longstanding and demonstrable policy of discrimination. <u>See</u> <u>Alexander v. Local 496, Laborers' Int'l Union of North America</u>, 177 F.3d 394 (6th Cir. 1999); <u>Haithcock v. Frank</u>, 958 F.2d 671 (6th Cir. 1992). The first category exists where there is evidence of present discriminatory activity, such as an employer who continues to presently impose disparate work assignments. The second category occurs where the employer has engaged in a long-standing and demonstrable policy of discrimination, with evidence that intentional discrimination against plaintiff's class was the employer's standard operating procedure. <u>Burzynski v. Cohen</u>, 264 F.3d 611, 618 (6th Cir. 2001). Under the continuing violations doctrine, "a plaintiff is entitled to have the court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." <u>Alexander</u>, 177 F.3d at 408 (quoting <u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 713 (2d Cir. 1996)).

However, the Sixth Circuit rarely extends this doctrine to §1983 actions. <u>Sharpe v. Cureton</u>, 319 F.3d 259, 267 (6th Cir. 2003). In <u>Sharpe</u>, the Sixth Circuit noted the Supreme Court's decision in <u>National Railroad Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002), where the Court held that discrete discriminatory acts such as termination, failure to promote, denial of transfer, or refusal to hire are not actionable if time barred under Title VII, even when they are related to acts alleged in timely filed charges. The Sixth Circuit concluded that the holding in <u>Morgan</u> was also applicable to §1983 claims of discrimination, and held that "plaintiffs are now precluded from establishing a continuing

11

violation exception by proof that the alleged acts of discrimination occurring prior to the limitations period are sufficiently related to those occurring within the limitations period." Id. at 267-68. Here, the plaintiff's demotion in September of 2002 constituted the type of discrete discriminatory act referred to in Morgan, and the fact that it is alleged to have been one of a series of discrete acts of discrimination is insufficient to save it from the limitations bar.

The evidence submitted in this case is also insufficient to establish the second category of continuing violation. To establish a longstanding and demonstrable policy of discrimination, a plaintiff must demonstrate something more than the existence of discriminatory treatment in his case. Haithcock, 958 F.2d at 679. Plaintiff does not allege class-wide discriminatory action, nor does he represent a class. See Sharpe, 319 F.3d at 269.

Plaintiff relies on an incident which allegedly occurred in 1999 between Nichols and a Hispanic officer, Officer Herrera. According to plaintiff, Nichols became upset when Officer Herrera refused to work overtime and pushed him against the wall. However, there is no evidence that Nichols' actions were the result of racial bias rather than simply being upset because Officer Herrera refused to comply with his order. There is no evidence that Officer Herrera ever alleged that Nichols pushed him because he was Hispanic, or that Herrera ever complained about discrimination in the Division. Even if the incident was racially motivated, this isolated incident, which occurred two years before Chief Forshey assumed leadership of the Division, and the alleged acts of discrimination in plaintiff's case are insufficient to show the

12

existence of a longstanding and demonstrable policy of discrimination against Hispanics as a class or to create a genuine issue of material fact in that regard.

Since plaintiff's complaint was filed on January 13, 2005, his §1983 claim is barred by the two-year statute of limitations insofar as it applies to his demotion in September of 2002. However, since the statute of limitations for an action under §4112.99 is six years, see Cosgrove v. Williamsburg of Cincinnati Mgmt. Co., Inc., 70 Ohio St.3d 281, 282, 638 N.E.2d 991 (1994), plaintiff's alleged discriminatory demotion is still a part of his §4112.99 claim.

III. Plaintiff's Discrimination Claims

A. Disparate Treatment

1. Standards

Plaintiff alleges that he was discriminated against on the basis of his race and national origin in the imposition of discipline and other employment decisions, and that defendants Forshey and Nichols violated his equal protection rights in making those decisions. During the time period in question, September of 2002 through January of 2004, plaintiff was the only officer employed by the Division who fell within a racial or ethnic minority class. Plaintiff brings his claims under §4112.02 and §1983. Ohio Rev. Code §4112.02(A) provides that it is an unlawful discriminatory practice:

> (A) For any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

13

To establish a claim under §1983, the plaintiff must prove that he has been deprived of a right secured by the Constitution or federal laws, by one acting under color of state law. <u>Day</u>, 749 F.2d at 1202. A plaintiff asserting claims of discrimination in employment on the basis of race must prove intentional discrimination by a public employer that violates the Equal Protection Clause. <u>Gutzwiller v. Fenik</u>, 860 F.2d 1317, 1325 (6th Cir. 1988). To establish a claim under the Equal Protection Clause, plaintiff must prove that a state actor intentionally discriminated against him because of his membership in a class. <u>Purisch v. Tennessee Tech. Univ.</u>, 76 F.3d 1414, 1424 (6th Cir. 1996). Proof of an equal protection claim against a public employer under §1983 requires a showing that the employer made an adverse employment decision with discriminatory intent and purpose. <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378 (1989)(§1983 requires proof of intentional discrimination); <u>Boger v. Wayne County</u>, 950 F.2d 316, 324-25 (6th Cir. 1991). The plaintiff must show that the adverse employment decision would not have been made "but for" his race and national origin. <u>Weberg</u>, 229 F.3d at 522.

The Ohio Supreme Court has held that federal case law interpreting Title VII is generally applicable to claims involving alleged violations of Chapter 4112. <u>See</u> <u>Genaro v. Cent. Transport, Inc.</u>, 84 Ohio St.3d 293, 703 N.E.2d 782 (1999); <u>Little Forest Medical Center of Akron v. Ohio Civ. Rights Comm.</u>, 61 Ohio St.3d 607, 609-610, 575 N.E.2d 1164 (1991); <u>Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.</u>, 66 Ohio St.2d 192, 196, 421 N.E.2d 128 (1981). The framework for proving Title VII claims announced in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792

14

(1973) also applies to equal protection claims in the employment context brought under §1983. <u>Perry</u>, 209 F.3d at 601; <u>Boutros v. Canton Regional Transit Auth.</u>, 997 F.2d 198 (6th Cir. 1993); <u>Gutzwiler</u>, 860 F.2d at 1325 (proving intentional discrimination for an equal protection claim under §1983 requires plaintiff to make the same showing required to prove a violation of Title VII).

A claim of discrimination may be proven by either direct or circumstantial evidence. <u>Anthony v. BTR Automotive Sealing Systems, Inc.</u>, 339 F.3d 506, 514 (6th Cir. 2003); <u>Byrnes v. LCI Communication Holdings Co.</u>, 77 Ohio St.3d 125, 128, 672 N.E.2d 145 (1996). To establish a discrimination claim based on circumstantial evidence, plaintiff must demonstrate a prima facie case in accordance with the guidelines set forth in <u>McDonnell Douglas Corp. v. Green</u>. <u>Anthony</u>, 339 F.3d at 514-15; <u>Coryell v. Bank One Trust Co. N.A.</u>, 101 Ohio St.3d 175, 803 N.E.2d 781 (2004). Plaintiff has the burden of establishing a prima facie case of discrimination by a preponderance of the evidence. <u>Anthony</u>, 339 F.3d at 514-15; <u>Omobien v. Ohio Civ. Rights Comm.</u>, 89 Ohio App.3d 100, 103-04, 623 N.E.2d 634 (1993). Once this prima facie case is established, the burden then shifts to the employer to show that it had a legitimate, nondiscriminatory reason for its action. <u>Anthony</u>, 339 F.3d at 514-15; <u>Kohmescher v. Kroger Co.</u>, 61 Ohio St.3d 501, 503, 575 N.E.2d 439 (1991).

If the employer articulates such a reason, the plaintiff must show that the articulated reason was merely a pretext for discrimination. <u>Anthony</u>, 339 F.3d at 514-15; <u>Kohmescher</u>, 61 Ohio St.3d at 503-04. A plaintiff can demonstrate pretext by showing that the proffered reason: (1) has no basis in fact; (2) did not

15

actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct. Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir. 1994); Carney v. Cleveland Hts.-Univ. Hts. School Dist., 143 Ohio App.3d 415, 429, 758 N.E.2d 234 (2001)("Mere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."). The ultimate burden of proof that the defendant intentionally discriminated against the plaintiff remains at all times on the plaintiff. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993).

To establish a prima facie case of disparate treatment, plaintiff must show: (1) that he is within a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that similarly-situated non-minority employees were treated more favorably. Clayton v. Meijer, Inc., 281 F.3d 605, 610 (6th Cir. 2002); Mitchell v. Toledo Hosp., 964 F.2d 577, 581-82 (6th Cir. 1992); Ferguson v. Lear Corp., 155 Ohio App.3d 677, 683, 802 N.E.2d 1141 (2003). The plaintiff must show a discriminatory motive. Mauzy v. Kelly Services, Inc., 75 Ohio St.3d 578, 583, 664 N.E.2d 1272 (1996).

An adverse employment action is a "materially adverse change in the terms and conditions of [plaintiff's] employment." Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999). Examples of adverse employment actions include firing, failing to promote, reassignment with significantly different responsibilities, a material loss of benefits, suspensions, and other indices unique to a particular situation. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998); Smith v. City of Salem, Ohio, 378 F.3d 566,

16

575-76 (6th Cir. 2004).  Employment actions that are <u>de minimis</u> are not actionable, and the change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.  <u>Bowman v. Shawnee State Univ.</u>, 220 F.3d 456, 462 (6th Cir. 2000); <u>Kocsis v. Multi-Care Mgmt., Inc.</u>, 97 F.3d 876, 886 (6th Cir. 1996).

Plaintiff must also show that similarly situated employees outside the protected class were treated differently or more favorably.  <u>See</u> <u>Koski v. Willowwood Care Center of Brunswick, Inc.</u>, 158 Ohio App.3d 248, 252, 814 N.E.2d 1235 (2004).  To be similarly situated, exact correlation is not required, but the plaintiff and the employee with whom the plaintiff seeks to compare himself must be similar in "all of the relevant aspects."  <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344, 352 (6th Cir. 1998)(quoting <u>Pierce v. Commonwealth Life Ins. Co.</u>, 40 F.3d 796, 802 (6th Cir. 1994)).  The non-minority employees must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them.  <u>Ercegovich</u>, 154 F.3d at 352; <u>Kroh v. Continental Gen Tire, Inc.</u>, 92 Ohio St.3d 30, 31, 748 N.E.2d 36 (2001); <u>Koski</u>, 158 Ohio App.3d at 252 (two employees are not similarly situated in all relevant respects if there is a meaningful distinction between them that explains their employer's different treatment of them).

<u>2. Demotion</u>

Plaintiff's first allegation of disparate treatment concerns his demotion from the rank of lieutenant to the rank of police

officer in September of 2002.  On June 22, 2002, Officers Robert Wells and Joseph Mullins assaulted Thomas Lucas during an arrest. Plaintiff was the supervisor on duty at the time.  Lucas suffered physical injuries which required medical treatment.  When plaintiff arrived at the scene, Lucas asked plaintiff for help, and claimed that the officers had kicked him.  The arrest was recorded on videotape.  Plaintiff did not report the incident to Chief Forshey or Deputy Chief Nichols.  When Chief Forshey received an anonymous phone call suggesting that he should review the videotape, he located the tape in Officer Mullins' gym bag, not in the location where videotapes are normally stored.  After viewing the tape, Chief Forshey concluded that the officers had used excessive force during the arrest.  Disciplinary actions were brought against Officers Wells and Mullins, but they resigned before their employment could be terminated.  They were also charged with criminal offenses and convicted.  A civil action was filed by Lucas against the City, Mullins and Wells.  The City paid $17,000 to settle the action.

A disciplinary action was commenced against plaintiff.  The disciplinary proceedings alleged violations of a number of departmental policies, including: (1) Rule 18 (handling of a citizen complaint; (2) Rule 17.3.3 (control of evidence; (3) Rule 31 (possessing property and evidence: (4) Rule 6 (unsatisfactory performance; (5) Rule 30 (divisional reports); (6) Policy 5.1.2 (accountability of supervisory personnel; (7) Policy 11.1.2 (supervisor's role in disciplinary process); and (8) Policy 19.1.9 (notification to chief of complaints regarding police officers). As a result of these proceedings, plaintiff was demoted on

September 21, 2000.

The Fraternal Order of Police filed a grievance on plaintiff's behalf, and the grievance was denied. The union then invoked the right of binding arbitration, and an arbitration hearing was held on November 6, 2003, and December 22, 2003. Plaintiff resigned on January 11, 2004. In May of 2004, the arbitrator reversed the decision to demote plaintiff, but imposed a sanction of a sixty-day suspension without pay. This monetary sanction exceeded the difference in pay between the ranks of lieutenant and patrol officer during the period of plaintiff's demotion.

Defendants do not dispute that the demotion qualifies as an adverse job action. Rather, they argue that plaintiff has not met his burden of showing that a similarly situated nonminority was not disciplined or was treated more favorably for comparable conduct. Plaintiff notes evidence concerning the disciplinary history of Lieutenant Wheeler. Wheeler's record included: (1) giving records to the former police chief without the permission of Chief Forshey, after which Chief Forshey reviewed the applicable policies with Wheeler; (2) notarizing a signature which he had not witnessed, then lying about witnessing the signature, after which Wheeler was given a seven-day suspension, forfeited his notary status, and was required to sign a Last Chance Agreement which specified that he could be terminated for any act of job-related deceit or dishonesty; (3) failing to read the written statements of witnesses in a domestic violence case; he was suspended for one day, but the sanction was suspended due to his improvement in work and attitude; (4) a written reprimand for not conducting a proper building safety check, failing to call personnel on an attempted aggravated

19

burglary, inability to perform assigned tasks, and failure to conform to the standards of his rank; and (5) a written reprimand for signing a form indicating that he had witnessed an officer reading a BMV-2255 form to an arrestee when in fact he had not been present. Defendants argue that the Last Chance Agreement signed by Lieutenant Wheeler was, as its name suggests, the final step prior to termination, and was not a lenient sanction, as suggested by plaintiff.

Plaintiff also notes the case of Lieutenant Schwart, who was the subject of a sexual harassment complaint filed by a female officer in December of 2003. Chief Forshey opened an investigation and notified the union, and Schwart was placed on administrative leave. Soon thereafter, Schwart resigned before any form of discipline could be imposed. Schwart's case was not similar to the situation which resulted in plaintiff's demotion, and the fact that no discipline was imposed was due to Schwart's resignation, not to any leniency motivated by race on Forshey's part.

From the evidence submitted, a jury could not reasonably find that plaintiff's case was similar to that of Lieutenant Wheeler. Plaintiff's failure to adequately supervise the officers under his command and to report Lucas's complaints to his supervisors about an incident which resulted in the two officers being convicted of criminal charges and the City being liable for a substantial civil settlement do not compare with the violations of policy committed by Lieutenant Wheeler. Plaintiff has pointed to no evidence of any other similarly-situated officers who were treated more favorably in the disciplinary process for comparable violations sufficient to meet his prima facie case.

20

Defendants have offered a nondiscriminatory reason for plaintiff's demotion, and the evidence is insufficient to raise a genuine issue of material fact on the question of pretext. Plaintiff contends that the sanction of demotion was too severe in light of the nature of his conduct. When faced with the charges, he denied having seen the videotape, and he took a voice test which showed that he was being truthful in that regard. He also argued that he was unaware that the Division had any particular policy regarding the storage of videotapes. However, in light of the arrestee's complaints about the use of excessive force, the fact that plaintiff did not then view the videotape or take steps to preserve that evidence lends support to the charge of failure to properly supervise the officers involved in the arrest.

It is significant that a neutral arbitrator, looking at the facts elicited during the disciplinary investigation, agreed with defendants' findings that plaintiff's performance was lacking. Although the arbitrator disagreed that demotion was the appropriate sanction, the arbitrator did impose a significant monetary penalty for plaintiff's neglect of his duties which exceeded the amount in salary actually lost to plaintiff due to his demotion. The evidence fails to raise a genuine issue of fact on plaintiff's claim of demotion.

3. Alleged Investigation for Losing Court Case

Plaintiff alleges that on or about September 4, 2003, he was investigated for losing a court case, and that he was told that he would be investigated every time he lost a case. Chief Forshey denies in his affidavit that plaintiff was investigated for losing a court case. Forshey Aff. ¶ 30. He stated that he received a

21

complaint from the City Attorney's Office that plaintiff had failed to adhere to standard procedure by test-firing prior to trial the gun involved in a case of brandishing of a firearm.  The defendant in that case was acquitted.  It is undisputed that plaintiff was not disciplined for this conduct.  Thus, there is no evidence that plaintiff suffered any adverse job action as a result of this incident.  Plaintiff offers no evidence other than his unsupported assertions that he was investigated for losing a case on this or any other occasion.  There is also no evidence that other officers were not investigated or disciplined for losing a case.  On the contrary, defendants have presented evidence that Lt. Boals, an officer outside the protected class, was given a verbal warning when he permitted three cases to proceed to court with unsigned and unnotarized affidavits.  Defendants have also offered a legitimate, nondiscriminatory reason for looking at plaintiff's conduct in this instance, namely, the complaint from the City Attorney's Office. The evidence does not support a claim of discrimination in regard to this charge.

4. Monitoring Lunch Break

Plaintiff alleges that on June 27, 2003, his residence was placed under surveillance by Deputy Chief Nichols due to an alleged infraction of lunch break rules.  On the date in question, a union meeting was scheduled to begin at plaintiff's residence at 12:30 p.m.  Chief Forshey received a tip that the union meeting would be held at plaintiff's house.  He also learned that plaintiff was the only officer at the meeting who was on duty.  Officers were entitled to a half hour lunch break.  Chief Forshey determined that plaintiff had exceeded his lunch break on that date.  Plaintiff was

22

given a written reprimand, and was docked a half hour of vacation time.

This sanction is not significant enough to amount to an adverse job action. See Rhodes v. Illinois Dep't of Transp., 359 F.3d 498, 505 (7th Cir. 2004)(docking one day's pay not adverse employment action); Allen v. Michigan Dep't of Corrs., 165 F.3d 405, 409-10 (6th Cir. 1999)(disciplinary actions in the form of counseling memoranda and supervisor's alleged action of monitoring employee more closely than nonminority employees did not constitute adverse employment actions); Gillard v. Norris, 857 F.2d 1095, 1098 (6th Cir. 1988)(three-day suspension without pay and written reprimands not sufficient to constitute a deprivation of property warranting due process protection); Mowery v. City of Columbus, No. 05AP-266 (10th Dist.), 2006 WL 620902 (Ohio App. Mar. 14, 2006)( negative appraisal of work performance not an adverse employment action).

Plaintiff has also failed to produce evidence that other similarly situated employees were not disciplined or investigated for violating the lunch rules. He testified that he was aware of one occasion in 2002 when some detectives took a lunch break for more than an hour, and that after plaintiff had been disciplined for exceeding the lunch time limit, two other officers spent fifty-four minutes at lunch. However, plaintiff acknowledged that he never reported this to Forshey or Nichols. A jury could not reasonably find a discriminatory motive in the failure to discipline other nonminority officers for a lunch time violation when there is no evidence that their supervisors were aware of the violations.

23

Defendants have also offered a legitimate, nondiscriminatory reason for the imposition of discipline, namely, that plaintiff violated the lunch time limit. Plaintiff testified in his deposition that he arrived at home an hour prior to the scheduled time for the meeting. He stated that Lieutenants Brooks and Schwart arrived at around 12:30 p.m. for the meeting. Plaintiff stated that he spent the next half hour talking about work with two officers until a call came in a half hour later. Thus, defendants correctly note that plaintiff's testimony shows that he spent one hour at home before other officers arrived, thereby exceeding the half-hour lunch period. Further, in his written response to the charges dated July 3, 2003, attached to defendants' motion for summary judgment, plaintiff stated:

> I stopped at home for lunch and right after I stay [sic] for a union meeting. During the meeting I started to discuss a case with Lt. Schwart and Lt. Brooks. Moments later I left to answer to a call. I didn't keep track of time and didn't know for how long I was there. I marked out for lunch. However I didn't marke [sic] back until I answered the radio.

To establish pretext, plaintiff must allege more than the existence of a dispute over the facts upon which discipline was based. Braithwaite v. Timken Co., 258 F.3d 488, 493 (6th Cir. 2001). An employer has an honest belief in its reason for a job action where the employer reasonably relied on the particularized facts that were before it at the time the decision was made. Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1117 (6th Cir. 2001). Based on the facts presented to Chief Forshey, he could reasonably conclude that plaintiff had exceeded the lunch time limit, and plaintiff has failed to produce evidence sufficient to show that defendants did not have a reasonable and good faith

24

basis for believing that he had violated the lunch time limits.

Plaintiff also argues that Forshey targeted him for discussing union business. He notes that Officer Peterman testified at his deposition that he had discussed union business at the station, but was not disciplined. However, there is no evidence that his supervisors were aware of this. Further, even assuming that Forshey targeted plaintiff due to his union activities, this would not constitute discrimination due to race or national origin.

The evidence is insufficient to raise a genuine issue of fact on this branch of plaintiff's disparate treatment claim.

5. Change of Shifts

Plaintiff also alleges that he was deprived of seniority rights by being required to switch shifts and days off. He states that his shifts were changed (the number of times is not specified), and that on one occasion, he was required to work two twelve-hour shifts in a row. However, he acknowledged at his deposition that there was nothing in the collective bargaining agreement regarding seniority rights applying to the switching of shifts or days off, and there is no evidence that plaintiff was deprived of any seniority rights. There is no evidence that plaintiff's salary was affected by the shift changes.

Forshey stated in his affidavit that shifts and days off were not determined by seniority, but rather by the operational needs of the Division of Police, and that the Division had to switch shifts to avoid a situation where all experienced officers were on the same shift and all inexperienced officers were on the same shift. Forshey Aff., ¶ 29. Plaintiff also acknowledged that it was standard operating procedure to move newer officers from shift to

shift so that they could learn how to work each shift. Since shift changes were routine for newer officers, shift changes for more experienced officers would also be needed on occasion to ensure a balance of experienced and inexperienced officers on each shift. Plaintiff has produced no statistical evidence showing that the changes in his shift assignment were more numerous than those of other officers. Officer Peterman's shifts were also changed. The evidence fails to show that nonminority officers were treated more favorably in the matter of shift changes or days off, and defendants have offered evidence of a nondiscriminatory reason for such changes.

6. Written Reprimands for Failing to Call Off for Duty

Section 8.1.3 of the Policies and Procedures Manual required all personnel taking sick leave to notify the Division of the intent to take sick leave at least one hour prior to the scheduled start of their shift. The union contract also required officers to notify the dispatcher or the on-duty supervisor of the intent to their intent to take sick leave.

On July 22, 2003, plaintiff received a written reprimand for failing to call off for a special duty assignment on June 27, 2003. On June 26, 2003, plaintiff called Lieutenant Wheeler and informed him that he was ill and could not come to work the next day. In a written statement dated July 3, 2003, plaintiff stated that he was going to attend the special duty even though he was sick, but he took medication several hours prior to the assignment and didn't get up in time. In a written statement dated July 23, 2003, plaintiff stated that since he had called in the day before the special duty was scheduled, Deputy Chief Nichols should have been

26

aware of his medical problems.

On December 15, 2003, plaintiff received a written reprimand from Lieutenant Boals. According to the statement on the written reprimand, a bank robbery occurred in Pataskala on December 2, 2003, necessitating additional manpower. Officer Burkhart attempted to contact other officers, including plaintiff. According to the charge statement, plaintiff told her that he might or might not be in for work for his shift, which was scheduled to begin at 3:00 p.m., because he was in the hospital having tests done. Plaintiff stated that he was unable to reach Lieutenant Boals, and that he talked with the secretary approximately one hour and forty-five minutes prior to the start of his shift and stated that he would not be coming into work.

As previously noted, a written reprimand is insufficient to constitute an adverse employment action. There is no evidence that plaintiff ever suffered any adverse consequence such as a reduction in salary or other changes in the conditions of his employment as a result of the reprimand. There is also no evidence that the sick leave notification policy was not enforced in cases involving similarly-situated nonminority officers.

Plaintiff notes that Officer Peterman was called on the day of the bank robbery and was notified that he should be prepared to report to work, and that Peterman then left the house but was not disciplined. However, Officer Peterman's supervisor was Lieutenant Schwart, and there is no evidence that Officer Peterman failed to report, not only for emergency duty, but also for a regularly scheduled shift, as was the situation in plaintiff's case. A jury could not find from the evidence that plaintiff's situation was

27

comparable to that of Officer Peterman.

The defendants have also submitted evidence that nonminority officers had been disciplined in the past for analogous types of violations.  For example, in 2001, Officer Gerardi was given a counseling statement for taking vacation days without prior approval, and in 2002, Lieutenant Boals was given a counseling statement about not having his phone with him at all times.  In 2002, two officers were given a written reprimand for refusing to come to work when ordered to do so because of a manpower shortage.  The evidence is insufficient to create a genuine issue of fact in regard to discrimination in the enforcement of the sick leave policy.

7. Assigning Calls to Plaintiff

Plaintiff alleges that Forshey and Nichols ordered other officers to send plaintiff on calls rather than taking the calls themselves.  He stated that on one occasion, he received a call from another officer when he was already on a call.  Plaintiff notified Lieutenant Wheeler that he was on a call.  Lieutenant Wheeler informed plaintiff that the officer who had sent him the call was at the station playing on the computer, and that this officer told Wheeler that he had been told to send plaintiff the call.  Plaintiff stated that he was informed by Lieutenant Wheeler that plaintiff performed more felony arrests in 2003 than the three detectives combined.

No statistical evidence has been presented showing that plaintiff was dispatched on a greater number of calls than other officers in the field.  The hearsay statements of Lieutenant Wheeler are not admissible in summary judgment proceedings.  U.S.

28

Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185, 1189 (6th Cir. 1997). Plaintiff's conclusory allegations and subjective beliefs are also insufficient to create a genuine issue of fact. Mitchell, 964 F.2d at 584-85.

## 8. Other Evidence Allegedly Showing Discrimination

Plaintiff also relies on other evidence which allegedly shows that defendants Forshey and Nichols acted with a discriminatory animus. He first alleges that the defendants did not take adequate steps to discipline officers who used racial epithets. Plaintiff states that in August of 2002, Lieutenant Wheeler called him a "sand nigger" during role call. Plaintiff alleges that he reported this to Nichols, and that Nichols told him to talk with Wheeler about the comment, and that if he had any further problems, to report these to Nichols.[2] Nichols assured him that any further problem would be investigated. Plaintiff did not tell Nichols that he did not want to discuss the matter with Wheeler himself. Plaintiff alleges that Wheeler repeated the comment two weeks later. However, there is no evidence that plaintiff reported this later incident to Nichols.

Even assuming that Wheeler did refer to plaintiff as a "sand nigger," a supervisor's isolated and offhand comment alleged to be racially derogatory is not necessarily sufficient to constitute direct evidence of discrimination. Singfield v. Akron Metropolitan Housing Auth., 389 F.3d 555, 560 (6th Cir. 2004). In Ercegovich,

---

[2]Forshey and Nichols testified that plaintiff never complained to them about Wheeler's use of the term "sand nigger." Wheeler testified in his deposition that he did not recall making the comment, stating that he and plaintiff were friends. He further testified that if he did in fact make such a comment, it would have been intended as a joke, not as an insult. For purposes of the summary judgment motion, the court will assume that Wheeler did in fact make the comment.

154 F.3d at 355, the Sixth Circuit set forth a two-step analysis for the admissibility of allegedly discriminatory comments.  The first step is to look at the identity of the speaker and whether a reasonable jury could conclude that the speaker was in a position to influence the employment decision.  Id. at 355.  The second step is to examine the substance of the remark to determine its relevancy to the plaintiff's claim that an impermissible factor motivated the adverse employment action.  Id.  Here, there is no evidence from which a jury could reasonably conclude that Lieutenant Wheeler had any influence or input on Chief Forshey's decision to demote plaintiff.  Further, the statement in question was an isolated racial epithet which expressed no opinion as to whether any particular job action should occur.  Thus, it was irrelevant to the subsequent decision to demote plaintiff.

The evidence is also insufficient to demonstrate that defendants maintained a policy of tolerance to racially offensive comments.  Although plaintiff now maintains that he would have preferred that Nichols speak with Wheeler about the comment, he did not tell Nichols that at the time.  Nichols expressed a willingness to investigate anything plaintiff brought to his attention, but there is no evidence that plaintiff ever renewed his complaints.

The evidence also shows that on another occasion, Officer Gerardi referred to plaintiff as a "sand nigger" while intoxicated and off duty at a party.  Plaintiff was unaware of this comment.  Officer Gerardi was notified that disciplinary charges would be brought against him for making the comment, but he resigned before the discipline could be imposed.  Plaintiff makes much of the fact that the paperwork on the charge had been completed prior to

30

Gerardi's resignation.  However, there is no evidence that the discipline would not have been imposed if Gerardi had not resigned. The fact that Gerardi resigned first does not support plaintiff's charge of lax enforcement.

Plaintiff also claimed that Lieutenant Schwart made degrading statements of an unspecified nature about him in front of other officers.  There is no evidence that the allegedly degrading statements were racial in nature.  Plaintiff was not present when the comments were made, and he relies on the hearsay statements of Fire Captain Williams.  This hearsay is not admissible in summary judgment proceedings.  Plaintiff also stated that Forshey and Nichols were not present when the allegedly degrading statements were made.  Even assuming that Lieutenant Schwart made degrading statements, there is no evidence that he influenced any of the employment decisions made by Forshey and Nichols concerning plaintiff.  Plaintiff also testified during his deposition that Lieutenant Schwart stated that there "was a cancer on second shift." Plaintiff's Dep., p. 41.  However, he agreed that the word "cancer" did not have an ethnic connotation.

Plaintiff also alleges that Forshey referred to him as "a criminal" during his grievance hearing.  However, the term "criminal" has no racial or ethnic connotation.  The comment simply reflects Chief Forshey's belief that plaintiff was just as culpable as the officers who were convicted of criminal charges for using excessive force during the arrest of Lucas because plaintiff did not assist Lucas or report the incident to his supervisors. Plaintiff also testified that he had no knowledge of Forshey or Nichols ever referring to his Hispanic origins.

31

Plaintiff testified that when Chief Forshey joined the force in April of 2001, he "felt hostility" from Chief Forshey. However, he does not offer evidence to support this vague, subjective feeling, to describe how this hostility was manifested, or to show that any hostility on the part of Forshey was based on plaintiff's race or ethnic origins. Further, all of the alleged acts of disparate treatment occurred from September of 2002 onward. At that time, Chief Forshey had been with the Division for approximately eighteen months, and plaintiff reported no problems during this earlier period.

Plaintiff also relies on an incident which occurred between Nichols and Officer Herrera, an Hispanic officer, in 1999, two years before Chief Forshey joined the Division. Plaintiff alleges that Nichols allegedly pushed Herrera against the wall because Nichols had asked Herrera to work overtime and he refused. In his deposition, Nichols stated that he did not have enough manpower to cover the street, and that when no one volunteered for overtime, he ordered Herrera to stay over, and Herrera became upset, stating that he had to go home and babysit before his wife left for work. Nichols responded that Herrera should put the Division first, and after Herrera responded, "It doesn't come first when your wife has a headache," Nichols pushed him against a wall. There is no evidence that any racial or ethnic terms were used. Plaintiff testified in his deposition that Herrera never complained that he thought that Nichols' actions were due to Herrera's race. There is no evidence that Herrera ever complained about discrimination in the department. The evidence suggests that Nichols acted out of anger because Herrera refused to obey an order, not because of any

32

racial animus.  This evidence is insufficient to establish a racial animus on the part of defendant Nichols.

Plaintiff also relies on evidence that in April of 2005, fifteen months after plaintiff's resignation, Carlos Martin, an Hispanic friend of plaintiff employed with the Los Angeles Police Department, wrote a letter to the editor of the local newspaper criticizing the Pataskala Police Department and Chief Forshey. Deputy Chief Brooks filed a complaint with the Los Angeles Police Department.  Forshey testified that he did not know whether Martin was Hispanic, that he did nothing in response to the article, and that he did not instruct or authorize Brooks to file the complaint. Even assuming that Brooks's actions were based on a discriminatory animus, no jury could reasonably attribute that animus to Forshey in regard to the employment decisions Forshey made over a year prior to this incident.

In summary, the above alleged incidents fail to supply direct or circumstantial evidence of discriminatory intent on the part of the defendants.

B. Hostile Work Environment and Constructive Discharge

Plaintiff also alleges that the defendants created a hostile work environment resulting in his constructive discharge.  The standards for making out a prima facie case of hostile work environment under Title VII also apply to a hostile work environment claim under §1983.  Boutros, 997 F.2d at 202.  To establish a prima facie case of hostile work environment based on race or national origin, plaintiff must show that: (1) he was a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his race or national

33

origin; (4) the harassment had the purpose or effect of unreasonably interfering with the employee's work performance or creating an intimidating, hostile or offensive work environment; and (5) the employer is vicariously liable. <u>Clark v. United Parcel Service, Inc.</u>, 400 F.3d 341, 347 (6th Cir. 2005); <u>Courie v. ALCOA</u>, 162 Ohio App.3d 133, 140, 832 N.E.2d 1230 (2005); <u>Delaney v. Skyline Lodge, Inc.</u>, 95 Ohio App.3d 264, 270, 642 N.E.2d 395 (1994).

Plaintiff must show that under the totality of the circumstances, the alleged conduct is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993). The sporadic use of abusive language or race-related comments or jokes is not sufficient to establish liability. <u>Clark</u>, 400 F.3d at 354. <u>See also</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998)(simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment). Factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Harris</u>, 510 U.S. at 23.

The harassment must be ongoing, rather than a set of isolated or sporadic incidents. <u>Clark</u>, 400 F.3d at 351. Plaintiff must show that the working environment was both objectively and subjectively hostile. <u>Harris</u>, 510 U.S. at 21-22; <u>Bell v. Cuyahoga Community College</u>, 129 Ohio App.3d 461, 717 N.E.2d 1189 (1998). A

34

racially hostile work environment claim is cognizable only if the purported harassment, viewed in conjunction with all of the circumstances, occurred because of the employee's race. <u>Jackson v. Quanex Corp.</u>, 191 F.3d 647, 662 (6th Cir. 1999); <u>Hampel v. Food Ingredients Specialties, Inc.</u>, 89 Ohio St.3d 169, 176-77, 729 N.E.2d 726 (2000)("R.C. 4112.02(A) does not reach disparate treatment on account of personal animosity; no matter how severe or pervasive the conduct, harassment does not constitute a discriminatory practice under R.C. 4112.02(A) unless based on a prohibited classification."). Alleged acts of harassment which are not overtly racial in nature may be considered. <u>Jordan v. City of Cleveland</u>, 464 F.3d 584, 596 (6th Cir. 2006)(facially neutral conduct may support finding of hostile work environment when conduct is viewed in context of other overtly discriminatory conduct); <u>Jackson</u>, 191 F.3d at 661-62.

Constructive discharge is not itself a cause of action, but rather a means of proving the element of an adverse employment action where the employee resigns instead of being fired. <u>Logan v. Denny's, Inc.</u>, 259 F.3d 558, 568 (6th Cir. 2001)(plaintiff may establish an adverse employment action by demonstrating that she was constructively discharged); <u>Kocsis</u>, 97 F.3d at 886 (same); <u>Starks v. New Par</u>, No. 98-1300, 1999 WL 357757 at *5 (6th Cir. May 11, 1999)(constructive discharge not a cause of action); <u>Kroll v. Disney Store</u>, 899 F.Supp. 344, 347 (E.D.Mich. 1995)(constructive discharge is not an independent claim, but rather requires an underlying cause of action for employment discrimination).

Proof of discrimination alone is not sufficient to show a constructive discharge. <u>Yates v. Avco Corp.</u>, 819 F.2d 630, 637 (6th

Cir. 1987). <u>See also</u> <u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129, 146-47 (2004)(proof of hostile work environment alone not sufficient); <u>Moore v. KUKA Welding Systems & Robot Corp.</u>, 171 F.3d 1073, 1080 (6th Cir. 1999)(proof of hostile work environment in violation of Title VII not enough by itself to prove constructive discharge).

Employee resignations are presumed to be voluntary. <u>Leheny v. City of Pittsburgh</u>, 183 F.3d 220, 227 (3d Cir. 1999). A plaintiff claiming constructive discharge must prove that there were other aggravating factors. <u>Yates</u>, 819 F.2d at 637. "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." <u>Moore</u>, 171 F.3d at 1080; <u>see also</u> <u>Suders</u>, 542 U.S. at 146-47 (to prove constructive discharge, plaintiff must also show working conditions so intolerable that a reasonable person would have felt compelled to resign). The constructive discharge two-pronged analysis requires an objective assessment of the employee's feelings and an inquiry into the employer's intent and the foreseeability of the impact its conduct had on the employee. <u>Peters v. Lincoln Elec. Co.</u>, 285 F.3d 456, 478 (6th Cir. 2002).

The first prong is an objective inquiry which focuses on whether "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." <u>Smith v. Henderson</u>, 376 F.3d 529, 553-34 (6th Cir. 2004); <u>see</u> <u>also</u> <u>Suders</u>, 542 U.S. at 147. The second prong, the "employer" inquiry, focuses on whether the

employer intended the work environment to cause the employee to resign. <u>Yates</u>, 819 F.2d at 637. In ascertaining the employer's intent, the court may consider whether it was reasonably foreseeable that the harassment and the employer's handling of it would cause the employee to resign. <u>Moore</u>, 171 F.3d at 1080 ("Intent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions.").

Ohio courts also recognize the constructive discharge theory. <u>See</u> <u>Mauzy</u>, 75 Ohio St.3d at 588-90. However, the Ohio standard differs from the Title VII standard in that it utilizes only the first prong of the inquiry, whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign. <u>Id</u>., 75 Ohio St.3d at syllabus paragraph four. The Ohio Supreme Court in <u>Mauzy</u> did not adopt the second prong, which makes an objective inquiry into the employer's intent. <u>See</u> <u>Peters</u>, 285 F.3d at 478.

Several factors may be considered in determining whether the employer created working conditions that a reasonable person would find intolerable, including: (1) demotion; (2) salary reduction; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee to resign; or (6) offers of continued employment on less favorable terms. <u>Logan</u>, 259 F.3d at 569. <u>See also</u> <u>Mauzy</u>, 75 Ohio St.3d at 589 (in applying test, a myriad of factors is considered, and no one factor is determinative).

Conditions supporting a constructive discharge must be objectively intolerable to a reasonable person. <u>Policastro v.</u>

37

Northwest Airlines, Inc., 297 F.3d 535, 539 (6th Cir. 2002).  An employee's belief that he was compelled to resign must be judged "without consideration of his undue sensitivities."  Risch v. Friendly's Ice Cream Corp., 136 Ohio App.3d 109, 112, 736 N.E.2d 30 (1999)(quoting Wilson v. Firestone Tire & Rubber Co., 932 F.2d 510, 515 (6th Cir. 1991)).  Complaints about the manner in which the employer supervised or criticized an employee's job performance and assigned job duties are normally insufficient to establish a constructive discharge.  Smith, 376 F.3d at 534.  See also Peters, 285 F.3d at 479 (hurt feelings and general suspicion based on conjecture that employer was targeting older employees for termination insufficient to establish constructive discharge); Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994)("Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."); Risch, 136 Ohio App.3d at 113 (offensive comments about plaintiff being a malingerer and the costs of her workers' compensation claim, and supervisor's general attitude of surliness or anger insufficient to create intolerable working conditions).

To act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly.  Driggers v. City of Owensboro, Ky., 110 Fed.Appx. 499, 507 (6th Cir. 2004)(citing Summit v. S-B Power Tool, (Skil Corp.), a Div. of Emerson Elec. Co., 121 F.3d 416, 421 (8th Cir. 1997)); Perry v. Harris Chernin, Inc., 126 F3d 1010, 1015 (7th Cir. 1997)("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.");

<u>Mayo v. Kenwood Country Club, Inc.</u>, 134 Ohio App.3d 336, 341, 731 N.E.2d 190 (1999).

The evidence fails to support a claim of hostile work environment, or to raise genuine issues of fact in that regard. Construing the evidence in favor of plaintiff, Lieutenant Wheeler used the term "sand nigger" at most on three occasions during a two-week period in August of 2002, over a year prior to plaintiff's resignation. Lieutenant Wheeler did not recall using the term, but stated that even if he did, he would have intended it to be a joke, not a derogatory comment. Officer Gerardi also used the term once while he was intoxicated and off duty at a party at his home. Plaintiff was unaware of the comment made by Officer Gerardi. Officer Gerardi was notified that he would be disciplined for his comment, and he resigned. Even accepting that these racial slurs occurred, they were isolated incidents.

None of the other employment decisions about which plaintiff complains were overtly racial or ethnic in nature. As indicated previously, the evidence falls short of establishing a discriminatory motive for those employment decisions, or of raising a genuine issue of material fact in that regard. These employment actions, which were not overtly racial in nature, and which were not shown from the evidence submitted to be racially motivated, do not constitute actionable harassment. Viewed both individually and in combination, none of the above alleged acts of harassment are sufficient to establish a racially hostile work environment.

The evidence is also insufficient to raise a genuine issue of material fact as to plaintiff's claim of constructive discharge. The employment decisions at issue were spread over a sixteen-month

period.  The demotion, the most serious of these actions, occurred
in September of 2002, at the beginning of the period, and plaintiff
continued to work for sixteen months after that.  During this
period, plaintiff received three written reprimands and his
vacation time was reduced by one-half hour.  There is no evidence
that the written reprimands resulted in any reduction in salary or
other tangible effect on the conditions of plaintiff's employment.
There is no evidence that he was threatened with termination as a
result of these reprimands.  There is no evidence that this
disciplinary record is unusually severe for a sixteen-month period.
The record shows that numerous nonminority officers in the
Pataskala Division of Police were disciplined for a variety of
infractions during the same time period.

The other alleged discriminatory decisions included being
assigned to shift changes and new days off an undisclosed number of
times, and being assigned calls by other officers.  As previously
indicated, the evidence is insufficient to show or to raise a
genuine issue of fact that any of these employment decisions were
based on plaintiff's race or national origin.  In addition,
complaints about the manner in which defendants supervised or
criticized plaintiff's job performance and assigned job duties is
insufficient to establish a constructive discharge.  Smith, 376
F.3d at 534.  See also Carter, 33 F.3d at 459 ("Dissatisfaction
with work assignments, a feeling of being unfairly criticized, or
difficult or unpleasant working conditions are not so intolerable
as to compel a reasonable person to resign.").

Based on the evidence, a reasonable jury could not conclude
that plaintiff's working conditions were so difficult or unpleasant

that a reasonable person in plaintiff's shoes would have felt compelled to resign. Plaintiff's employment was governed by a collective bargaining agreement. Plaintiff had filed a union grievance contesting his demotion which had been submitted to an independent arbitrator. Thus, resignation was not plaintiff's only alternative. See Driggers, 110 Fed.Appx. at 507 (officer who could not be dismissed without a formal administrative hearing could not reasonably conclude that she had no alternative but to quit the police force and sue).

As to the §1983 claim, the evidence also fails to show that defendants should have foreseen that plaintiff would resign as a result of the various disciplinary sanctions and other employment actions. Plaintiff continued to work for sixteen months after his demotion, the most serious of the employment actions. His grievance in regard to the demotion was pending before the arbitrator at the time of his resignation. As to the other disciplinary actions and employment decisions, there is no evidence which would support a finding that it would have been reasonably foreseeable to the defendants that their handling of these matters would cause plaintiff to resign. Any reasonable person employed as a police officer with a police department, where discipline is essential to effective operation of the department, would understand that strict enforcement of the rules is part and parcel of the job. The evidence is insufficient to demonstrate that the defendants acted with a discriminatory animus and with the intent of prompting plaintiff to resign, or to raise a genuine issue of fact in that regard.

Defendants are entitled to summary judgment on plaintiff's

41

constructive discharge theory.

C. Conclusion as to Claims under §§4112.02 and 4112.99 and §1983

For the foregoing reasons, the court finds that defendants are entitled to summary judgment on plaintiff's claims under §§4112.02 and 4112.99 and §1983.[3]

IV. Conclusion

In accordance with the foregoing, defendants' motion for partial judgment on the pleadings (Doc. No. 26) and defendants' motion for summary judgment (Doc. No. 30) are hereby granted. The clerk is directed to enter judgment in favor of the defendants on plaintiff's claims.


Date: November 9, 2006          s\James L. Graham
                                James L. Graham
                                United States District Judge

---

[3]The court notes that even if plaintiff were permitted to proceed on his substantive due process theory, the above analysis would also dispose of that claim. A substantive due process claim requires a showing of the violation of a fundamental right, and an employment action which shocks the conscience. Perry, 209 F.3d at 609. Since the record fails to support a violation of plaintiff's equal protection rights or to show the existence of a genuine issue of fact in regard to his discrimination claims, any substantive due process claim would fail as well.